UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SWIFT SPINDRIFT, LTD.,                          :

                Plaintiff,                     :

   -against-                                        :

ALVADA INSURANCE, INC., et al.,          :

                                     :

                Defendants.
------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __7/24/2013__

**MEMORANDUM
DECISION AND ORDER**

09 Civ. 9342 (AJN) (FM)

**FRANK MAAS,** United States Magistrate Judge.

        Plaintiff Swift Spindrift, Ltd. ("Swift") brings this insurance coverage action against several insurance carriers and an insurance broker to recover damages allegedly arising out of the protracted detention of one of its cargo ships by Libyan authorities in Tripoli. The defendants (collectively, "Alvada") have moved to compel the production of certain documents that Swift has withheld on the basis of attorney-client privilege. (ECF No. 41). For the reasons that follow, that motion is granted in part and denied in part.

I.    Background

    A.    Factual Background

        Swift is a Liberian single-asset corporation that operated the M/V Swift Spindrift ("Swift Spindrift"), an oceangoing cargo ship. (See ECF No. 21 ("Amended Complaint" or "Am. Compl.") ¶¶ 3-4). The Swift Spindrift was one of several vessels

comprising the "Grace Line," a fleet of ships owned by John Grace ("Grace") and Lola Grace through a number of closely-held companies and family trusts.  (See Decl. of Joseph G. Grasso, Esq., sworn to on Dec. 28, 2012 (ECF No. 43) ("Grasso Decl."), Ex. B at 9-14).

In November 2008, the Swift Spindrift arrived in Tripoli with a cargo of corn being shipped to a Libyan importer.  (Am. Compl. ¶¶ 39-40).  Alleging that the corn was defective, the importer obtained a court order arresting the Swift Spindrift in port pending resolution of the dispute.  (Id. ¶¶ 41-42 & Ex. A).  The Libyan court further directed that, to obtain the vessel's release, Swift post security, which, according to Swift, was to take the form of a $1.6 million bank guarantee.  (Id. ¶¶ 42-43).  In January 2009, Swift posted an irrevocable letter of credit in that amount, but the Libyan government never released the Swift Spindrift.  (Id. ¶¶ 44-45).  Despite numerous applications and motions before the Libyan court, as well as an appeal, the Swift Spindrift remained detained in port until June 17, 2010, when Swift sold the ship to a third party on an "as-is, where-is" basis for $2.3 million.  (Id. ¶¶ 46-48, 52).

Swift brings this case under the Court's admiralty and maritime jurisdiction.  (Id. ¶ 1). Swift seeks to recover the difference between the fair market value of the vessel and its sales price under two marine war-risk policies on the theory that the prolonged detention of the Swift Spindrift rendered it a "constructive total loss."  (Id. ¶¶ 53-113). Swift also seeks reimbursement for alleged "sue and labor" expenses associated with its

efforts to recover the vessel, including the cost of counsel in Libya. (Id. ¶¶ 69-83, 100-113). The total damages claimed exceeds $10 million. (Id. at 35 ¶ H).

During discovery, Swift produced approximately 8,000 documents, including two email chains containing communications from Charles Cumming ("Cumming"), an in-house lawyer for Grace Line, who also handled operational matters. (Pl.'s Resp. in Opp. to Defs.' Mot. to Compel (ECF No. 44) ("Pl.'s Opp. Mem.") at 8; Grasso Decl., Ex. A at 29-32, 73).

The first email chain (the "Coverage Emails") contains, among other matters, advice addressed to Peter Metz ("Metz"), Swift's sole director, as to whether the circumstances in Libya gave rise to a valid claim under Swift's war-risk policies. (Grasso Decl, Ex. C at 1). Cumming's advice to Metz was that, although "[a]bandonment [of the Swift Spindrift] may be an option, . . . there [was] no war risk involved in this situation and[, thus,] coverage would not come into play." (Id.). Cumming also noted that the ship had "suffered no physical damage so Hull and Machinery cover[age also would] not come into play." (Id.).

The second email chain (the "Libya Emails") reflects communications among Cumming, Swift's local counsel in Libya, lawyers at a London firm representing Swift in a related arbitration, and staff at "V-Ships," a company hired by Swift to manage the Swift Spindrift's daily operations. (Grasso Decl., Ex. D). These emails primarily concern the status of the Libyan proceedings and the issuance of the letter of credit. In an email dated November 26, 2008, Swift's Libyan counsel estimated that a $1.6 million

3

letter of credit would be sufficient to secure the release of the Swift Spindrift. (See id.). Later, on July 1, 2009, counsel in Libya informed Cumming that the amount assessed by the Libyan court was actually closer to $2.9 million. (Id.). Cumming expressed his "alarm[]" at this development and noted that a judgment in that amount might render the Swift Spindrift a constructive total loss. (Id.).

In March 2012, Grace and Metz were deposed. Both testified generally about advice they had received from Cumming related to the Swift Spindrift's detention in Libya. Metz testified that, although the Libyan importer was seeking to recover close to $3 million, Swift had furnished a letter of credit for only $1.6 million because he believed that amount was "sufficient" to satisfy the Libyan court and secure the release of the ship. (Id., Ex. A at 114-19, 191-93). According to Metz, in arriving at that determination, he "relied" on Cumming, as well as Swift's local counsel in Libya, "who was in a position to know the facts on the ground better than [he] did." (Id. at 192-94). When he was asked why Swift had failed to secure the full amount sought by the Libyan importer, Metz responded that his understanding was that "[d]eviating from the $1.6 million [letter of credit] would not have made a difference in changing when the ship would have been released." (Id. at 117-18).

Grace's testimony was less detailed. He acknowledged discussions with Metz and Cumming regarding the situation in Libya, but could not recall any specifics of those conversations. (Id., Ex. B at 81-84, 87-88). He also did not testify about any specific legal advice that he had received from Cumming.

4

B.    <u>Motion to Compel</u>

The present discovery dispute arises out of Swift's 163-page privilege log, which includes emails relating to a wide variety of topics concerning the Swift Spindrift's detention in Libya, including the need to obtain legal services in Tripoli, Swift's legal obligations under the ship's charter agreement, the unloading of the Swift Spindrift's cargo, potential legal claims against Swift, securing a bank guarantee to satisfy the judgment of the Libyan court, delays in the ship's release, efforts to obtain assistance from the State Department, and the orders entered by the Libyan court. (<u>See</u> Grasso Decl., Ex. E). Many of these emails involve communications between or among Cumming, Swift's principals, Swift's solicitors in London, and local counsel in Libya. (<u>Id.</u>). Many others, however, appear to be messages sent to third parties or communications between or among non-lawyers. (<u>Id.</u>).

Alvada contends that it is entitled to all of the documents identified in Swift's privilege log because Swift waived its attorney-client privilege by voluntarily disclosing the Coverage and Libya Emails and allowing Metz and Grace to testify about the information and advice that they had received from counsel. (Defs.' Mem. of Law in Supp. of Mot. to Compel (ECF No. 42) ("Defs.' Mem.") at 3). Alvada further contends that any documents on the privilege log that were disclosed to third parties are no longer privileged and must be disclosed. (<u>Id.</u> at 5-6). Finally, Alvada alleges that Swift's assertion of privilege is overbroad because many of the withheld communications relate solely to business, rather than legal, matters. (<u>Id.</u> at 5).

5

Swift disagrees. Swift maintains that its voluntary disclosure of the Coverage and Libya Emails did not result in a waiver of its attorney-client privilege because it produced those communications only after determining that they were, at best, "questionably privileged." (Pl.'s Resp. in Opp. to Defs.' Mot. to Compel (ECF No. 44) ("Pl.'s Opp. Mem.") at 8). Swift also argues that Alvada has suffered no prejudice from its partial disclosure and that any waiver should be limited to the communications already disclosed. (Id. at 9). Although Swift concedes that many of the emails identified in its privilege log were shared with third parties, Swift contends that those documents nevertheless remain privileged because those parties were acting as Swift's "agents." (Id. at 14-15). Finally, Swift alleges that any communications concerning operational or business matters were properly withheld because the communications were predominantly of a "legal character." (Id. at 12-13).

II.   Applicable Law

Federal law governs privilege disputes in admiralty and maritime cases. See Am. S.S. Owners Mut. Prot. and Indem. Ass'n v. Alcoa S.S. Co., 232 F.R.D. 191, 196 (S.D.N.Y. 2005). Thus, the attorney-client privilege applies to "communications [a] between a client and his or her attorney [b] that are intended to be, and in fact were, kept confidential [c] for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011). "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 119 F.3d 210, 214 (2d Cir. 1997).

The purpose of the privilege is to "encourage clients to make full disclosure to their attorneys" in order to ensure the quality of subsequent legal advice. Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed. 2d 39 (1976). By shielding attorney-client communications against disclosure, however, the privilege often forecloses parties from obtaining relevant evidence that would otherwise be discoverable. For that reason, the privilege is "narrowly" construed and applied "only where necessary to achieve its purpose." In re County of Erie, 473 F.3d 413, 418 (2d Cir. 2007) (internal quotation marks omitted). In addition, there are a number of ways in which the privilege can be waived. Disclosing confidential attorney-client communications to third parties, including litigation adversaries, generally "'eliminates whatever privilege the communication may have originally possessed.'" United States v. Finazzo, No. 10-CR-457 (RRM) (RML), 2013 WL 619572, at *6 (E.D.N.Y. Feb. 19, 2013) (quoting In re Horowitz, 482 F.2d 72, 81 (2d Cir. 1973)). Similarly, a party may be held to have impliedly waived the privilege "when a client testifies concerning portions of the attorney-client communication, . . . when a client places the attorney-client relationship directly at issue, . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense." In re County of Erie, 546 F.3d at 228 (quoting Sedco Int'l S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982)).

As the Second Circuit has explained, fairness is the principal consideration in determining whether a party has waived the attorney-client privilege. Id. at 229; see also In re Sims, 534 F.3d 117, 132 (2d Cir. 2008) ("In dealing with testimonial privileges

other than the psychotherapist-patient privilege, we have held that a waiver may be implied in circumstances where it is called for in the interests of fairness."). "Whether fairness requires disclosure has been decided by the courts on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted." In re Grand Jury Proceedings, 219 F.3d 175, 183 (2d Cir. 2000).

III.   Analysis

    A.   Swift's Disclosure of Attorney-Client Information During Discovery

Alvada contends that Swift's disclosure of attorney-client information during discovery has resulted in a "general waiver [of the attorney-client privilege] as to communications concerning the proceedings in Libya and the precipitating events." (Defs.' Mem. at 3). The disclosures to which Alvada refers relate to two discrete subject matters: (1) whether Swift believed that it had a coverage claim under Swift's war-risk policies; and (2) whether Swift posted adequate funds to secure the Swift Spindrift's release. Alvada believes that Swift's disclosure of portions of its attorney-client communications concerning these topics entitles it to review all other privileged communications relating to similar subject matter. (Id. at 4).

Despite its obvious application, neither party has mentioned Rule 502 of the Federal Rules of Evidence, which governs the disclosure of privileged information to a litigation adversary in the course of a "Federal proceeding." Seyler v. T-Systems N.A., Inc., 771 F. Supp. 2d 284, 287-88 (S.D.N.Y. 2011). Perhaps this omission should not be a surprise since remarkably few lawyers seem to be aware of the Rule's existence despite

8

its enactment nearly five years ago.  See Paul W. Grimm, Lisa Yurwit Bergstrom & Matthew P. Kraeuter, Federal Rule of Evidence 502:  Has It Lived Up to Its Potential?, XVII Rich. J. L. & Tech. 8 (2011).  That is unfortunate because Rule 502 was specifically designed to avoid vexatious and time-consuming privilege disputes such as this one.  See Fed. R. Evid. 502(d).

Rule 502 was intended to "resolve some longstanding disputes in the courts about the effect of certain disclosures of communications or information protected by the attorney-client privilege" and "respond[] to the widespread complaint that litigation costs necessary to protect against waiver of attorney-client privilege or work product have become prohibitive due to the concern that any disclosure (however innocent or minimal) will operate as a subject matter waiver of all protected communications or information." Rule 502 advisory committee's note.  To effectuate these objectives, Rule 502 sets forth a uniform framework for determining the extent to which a party's partial disclosure of attorney-client information waives the privilege as to undisclosed privileged communications concerning the same subject matter.

The analysis under Rule 502 differs depending upon whether a party's disclosure is intentional or inadvertent.  Swift acknowledges that it intentionally disclosed the Coverage and Libya Emails by voluntarily producing them to Alvada during the course of discovery.  (Pl.'s Opp. Mem. at 8).  It further concedes that these documents were privileged, albeit "questionably" so.  (Id.).  In addition, to the extent that Metz or Grace testified about attorney-client information during their depositions, it can be

assumed that their disclosures were voluntary, since neither witness was instructed not to answer.  (See Grasso Decl. Exs. A, B).  Consequently, the only question is whether other attorney-client communications of the same nature and subject matter must be produced as a result of Swift's disclosures.

Rule 502(a) governs intentional disclosures.  That section provides that a partial disclosure of attorney-client information waives the privilege for undisclosed communications only if "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together."  Fed. R. Evid. 502(a).  The Advisory Committee's Note explains that "a subject matter waiver . . . is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary."  Rule 502(a) advisory committee's note.  Thus, even when a disclosure is intentional, the scope of any subject matter waiver ordinarily is quite "narrow."  Seyler, 771 F. Supp. 2d at 288.

Swift's disclosures in this case have not resulted in the unfairness contemplated by Rule 502(a).  At the outset, the selective production of the Coverage Emails has not afforded Swift any tactical advantage in this litigation.  Indeed, those emails are <u>not</u> favorable to Swift's case and consequently do not have the potential to be used selectively at trial to Alvada's detriment.  The Coverage Emails, in fact, reveal only that Swift had received legal advice that the situation in Libya likely did <u>not</u> give rise to a

valid coverage claim under its war-risk policies. Even if one were to assume that this constitutes an admission by a party-opponent, see Fed. R. Evid. 801(c)(2)(D), Alvada has failed to demonstrate that Swift intends to rely on the Coverage Emails or that any unfair prejudice has resulted from their partial disclosure. Thus, Swift's production of the Coverage Emails does not warrant compulsory disclosure of other privileged documents related to the same subject matter. See Seyler, 771 F. Supp. 2d at 288 (citing Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. 480, 521(Fed. Cl. 2009) (declining to find subject matter waiver where the disclosures "lacked any strategic value" and did not benefit the disclosing party's case)).

      Turning to the Libya Emails and related deposition testimony, there similarly is no indication that Swift's disclosures have been selective or misleading in any way. The emails consist of an innocuous discussion about the status of the Libyan proceedings and the amount of security required to obtain the Swift Spindrift's release. The deposition testimony likewise is unremarkable. Metz stated that he sought and received legal advice about the events in Libya before making a final decision about how much money to post to satisfy the court's judgment. Grace testified only that he had consulted with attorneys, but revealed no confidential information or details about those consultations. Accordingly, it is unclear how disclosure of this general information has prejudiced Alvada's case.

Alavada contends that Swift's assertion of privilege with respect to related documents conceals important factual information about the action in the Libyan court and the measures Swift took to obtain the vessel's release. (Defs.' Mem. at 4-5). The mere need for factual information, however, does not entitle a party to obtain communications protected by the attorney-client privilege. Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 522 (S.D.N.Y. 1992) ("[the attorney-client] privilege, unlike most others, is absolute in the sense that it cannot be overcome merely by a showing that the information would be extremely helpful to the party seeking disclosure"). Alvada makes a similar argument with respect to Swift's "sue and labor" claim, contending that the nature of that claim entitles it to "examine the work that these attorneys are said to have performed." (Defs.' Mem. at 5). Much in the way that reasonableness is determined in attorneys' fees petitions, however, such an examination obviously can be conducted without having to disclose all of Swift's privileged communications.

Alvada argues further that Swift has waived the attorney-client privilege by placing its reliance on the advice of counsel at issue. (See Defs.' Mem. at 4-5; Defs.' Reply Mem. of Law in Further Supp. of Mot. to Compel (ECF No. 45) ("Defs.' Reply") at 3-4). While it is true that the assertion of an advice-of-counsel defense ordinarily results in an implied waiver of the privilege, see In re County of Erie, 546 F.3d at 228, Swift has not raised that defense in this case. Indeed, Swift has expressly disavowed that defense. (See Pl.'s Opp. Mem. at 10-11). Furthermore, should Swift seek to change its position at a later date, it will risk having waived the defense. Arista Records LLC v. Lime Group

LLC, No. 06 CV 5936 (KMW), 2011 WL 1642434, at *2 (S.D.N.Y. Apr. 20, 2011) ("a party who intends to rely on the advice of counsel must make a full disclosure during discovery; failure to do so constitutes a waiver of the advice-of-counsel defense") (internal quotation marks and emphasis omitted).

The remainder of Alvada's argument consists of vague references to the well-established precept that it is unfair for a party to use the attorney-client privilege as both a "sword" and a "shield." (See Defs.' Mem. at 4; Defs.' Reply at 3-4). Stated slightly differently, that principle prohibits a party from "us[ing] the privilege to prejudice his opponent's case or disclos[ing] some selected communications for self-serving purposes." United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) (citing In re von Bulow, 828 F.2d 94, 103 (2d Cir. 1987)). What is missing from the discussion, however, is any showing that Alvada's case has been unfairly disadvantaged or that it has been prejudiced by Swift's conduct. Indeed, Alvada simply has not demonstrated how Swift's partial disclosure of this information could lead to a selective and deceptive presentation of evidence at trial. See Rule 502 advisory committee's note. Given the nature of the issues in the case, none of the fairness concerns enunciated in Rule 502 appear to be implicated by Swift's partial disclosures. Accordingly, there has not been a waiver of the privilege with respect to undisclosed communications concerning similar subject matter.

B.     Disclosure of Communications to Third Parties

Alvada also contends that Swift's disclosure of attorney-client emails to third parties has waived its privilege as to those communications. (Defs.' Mem. at 5-6). Alvada reasons that, because Swift had no "legal purpose" for sending these third parties such attorney-client communications, the documents are not privileged and must be produced. (Defs.' Reply at 7-8). Although Swift concedes that many communications on the privilege log were addressed or copied to non-attorney third parties, it argues that those disclosures did not result in waiver because the third parties who received the communications "were acting as agents of [Swift], within the scope of their contractual duties," and it was "necessary to provide necessary information to those concerned [and] to facilitate fully informed advice and opinions." (Pl.'s Opp. Mem. at 14-15).

"It is well-settled that the voluntary disclosure of confidential material to a third party waives any applicable attorney-client privilege." Crawford v. Franklin Credit Management Corp., 261 F.R.D. 34, 43 (S.D.N.Y. 2009) (internal quotations omitted). An exception to this rule exists for communications disclosed to a third party who acts as the client's agent. In re Application Pursuant to 28 U.S.C. § 1782, 249 F.R.D. 96, 101 (S.D.N.Y. 2008). In those circumstances, "the proponent of the privilege must show, first, that the client had a reasonable expectation of confidentiality in the disclosure of the material to the third party, and second, that 'disclosure to the third party was necessary for the client to obtain informed legal advice.'" Id. (quoting National Educ. Training Group, Inc. v. SkillSoft Corp., No. M8-85 (WHP), 1999 WL 378337, at *4 (S.D.N.Y. June 10, 1999)).

14

A review of Swift's privilege log reveals numerous emails that include third parties as recipients. The relationship between Swift and those parties is not apparent from the face of the privilege log or any other materials proffered in connection with this discovery dispute. There also appear to be emails exchanged solely between or among third parties. These communications seem to bear no connection to the procurement of legal advice. An example of this is document SSL 008893, which is an email from Andrea Luzzi to Jose Seijas, Mike Littedale, and John Edward Sullivan concerning the "dispute re[garding] cargo delivery in Libya." (Grasso Decl., Ex. E at 13). While the privilege log does not explain who any of these individuals are, it appears that none of them are lawyers.

Swift is correct in observing that the attorney-client privilege may extend to communications shared with its agents, but it makes no attempt to identify which emails it believes are protected under this theory. Rather, Swift merely states generally that all of the third parties included on the shared communications were "acting as [its] agents." (Pl.'s Opp. Mem. at 14). Swift provides only one example: a company named V-Ships that Swift had hired to manage the "various day to day logistical and operational issues associated with" the Swift Spindrift was included on certain communications between in-house counsel and corporate principals in order to "facilitate" the transmission of legal advice. (See id. at 14-15). Swift does not explain, however, how including V-Ships on their attorney-client emails assisted the process, or even make clear which entries on the privilege log relate to the V-Ships communications.

Swift similarly has failed to demonstrate that disclosure to V-Ships was necessary in order for it to obtain informed legal advice. "Necessary," in the context of third party disclosures, "means more than just useful and convenient, but rather requires that the involvement of the third party be indispensable or serve some specialized purpose in facilitating the attorney-client communications." Allied Irish Banks v. Bank of America, N.A., 240 F.R.D. 96, 103 (S.D.N.Y. 2007) (quoting National Educ. Training Group, 1999 WL 378337, at *4). It does not appear that V-Ships served any specialized purpose here other than perhaps to provide factual information to Cumming and Swift's principals. That, however, is insufficient to avoid a privilege waiver. See In re Application Pursuant to 28 U.S.C. § 1782, 249 F.R.D. at 101-02 (privilege waived for communications disclosed to third party who merely aided in "clarifying certain factual issues," even though those issues had "legal implications"). Consequently, any documents disclosed to V-Ships must be produced.

Additionally, because Swift has failed to show that the disclosure of emails to third parties other than V-Ships was necessary to facilitate the attorney-client relationship, the privilege also has been waived with respect to such communications. Any communications disclosed to third parties other than V-Ships consequently also must be produced.

    C.    Cumming's Dual Role

Alvada's final argument concerns Cumming's dual role as in-house counsel and business advisor at Swift. Alvada contends that any communications concerning

Cumming that arise out of his business role are not privileged and must be disclosed. (See Defs.' Mem. at 5).

"The Second Circuit has made clear that only those communications related to 'legal, as contrasted with business, advice' are protected." TVT Records v. Island Def Jam Music Group, 214 F.R.D. 143, 144 (S.D.N.Y. 2003) (quoting In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1037 (2d Cir. 1984)); see also In re Omnicom Group Inc. Secs. Litig., 233 F.R.D. 400, 404 (S.D.N.Y. 2006) ("Communications that seek or involve principally the performance by the attorney of non-legal functions are not protected.") (citations omitted). When in-house counsel occupies both a legal and operational role, the test for determining if a document is privileged is "whether the predominant purpose of the communication [was] to render or solicit legal advice." In re County of Erie, 473 F.3d at 420.

It is undisputed that, in addition to his role as in-house counsel, Cumming also handled certain operational and business matters for Swift. It follows that Cumming would have generated emails or other documents that related principally to his role as a business advisor, rather than his role as counsel. Swift concedes that the attorney-client privilege does not apply to communications if Cumming's predominant purpose was to render operational or business advice. Thus, to the extent that it has not done so already, Swift must disclose any communications, or portions thereof, that were sent or received primarily for purposes other than providing legal advice.

IV.  Conclusion

For the foregoing reasons, Alvada's motion to compel (ECF No. 41) is granted in part and denied in part.

SO ORDERED.

Dated:   New York, New York
         July 24, 2013

                                    _____
                                    FRANK MAAS
                                    United States Magistrate Judge

Copies to:

Hon. Alison J. Nathan
United States District Judge

All counsel (via ECF)