UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 9 2016

---

Swift Spindrift Ltd.,

               Plaintiff,

     –v–

Alvada Insurance Inc., et al.,

               Defendants.

---

09-cv-9342 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Swift Spindrift Ltd. ("Swift") brings this suit against two sets of insurance underwriters—referred to as the "Seascope Defendants," the "B&P Defendants," and, collectively, "the Underwriters"—and a marine insurance broker, Arthur J. Gallagher Risk Management Services, Inc. ("Gallagher"). Swift, the owner of a bulk cargo vessel known as the M/V Swift Spindrift ("the Swift Spindrift"), seeks damages from the Underwriters for what it alleges were breaches of two insurance policies that provided coverage for the Swift Spindrift. The policies cover certain named perils, including, in certain circumstances, "arrests." Swift claims that it was entitled to recover under both policies after the Swift Spindrift was arrested in Libya—where it remained for more than six months—pursuant to a commercial dispute between Swift and the importer that had purchased the vessel's cargo.

Each party in this case has filed a motion for summary judgment. Swift has also filed a motion to exclude the Underwriters' proposed expert witness. For the reasons that follow, the Underwriters' motion for summary judgment is GRANTED, Swift's motion for summary judgment is DENIED, and Gallagher's motion for summary judgment and Swift's motion to exclude are DENIED as moot.

## I.      BACKGROUND

### A.      Factual Background[1]

Swift owned and operated the Swift Spindrift during the time period relevant to this case. Underwriters 56.1 CS ¶ 4.  In the fall of 2008, the Swift Spindrift loaded more than 20,000 metric tons of corn in San Lorenzo, Argentina and departed for Tripoli, Libya.  Swift 56.1 CS ¶¶ 9, 10.  While the vessel was en route to Tripoli, the time charterers (i.e., the entities that had leased the vessel for the period that encompassed the voyage) requested that the ship divert to Antwerp to discharge at least a portion of its cargo.  *Id.* ¶¶ 10, 11.  Swift agreed to the request, though it claims it was contractually obligated to do so.  *Id.* ¶ 11.  The Libyan entity that was contracted to receive the cargo, Tasharkiat Green Valley Animal Foods Ltd. ("the Importer"), expressed concern when it learned that the vessel was heading to Antwerp.  *Id.* ¶ 12.  Swift then discovered that the request to have the Swift Spindrift stop in Antwerp was actually an effort to arrest all of the vessel's cargo there, pursuant to a dispute between the Importer and a company affiliated with the vessel's sub-charterer.  *Id.* ¶ 13.  Before the Swift Spindrift reached Antwerp, however, it turned back and proceeded to Tripoli.  *Id.* ¶ 14.

As the vessel was en route to Libya, Swift learned from its Libyan counsel, Taher Shtewi, that the Importer planned to file a multi-million dollar lawsuit and to arrest the Swift Spindrift in Tripoli as a means of securing the claim.  *Id.* ¶ 18.  The Importer ultimately did file suit, seeking approximately $2.5 million in damages based, at least in part, on the alleged delay in the Swift Spindrift's arrival in Tripoli.  *Id.* ¶ 16.  The vessel made it to Tripoli on November 16, 2008, and was served with legal process on November 24, 2008.  Underwriters 56.1 CS ¶¶ 8, 9.  Although the parties dispute the exact nature of this process (Swift calls it a "writ of arrest" and the Underwriters call it a "writ of attachment," *see* Swift 56.1 CS ¶ 17), they agree that the North Tripoli Court of First Instance (the "Libyan Court") issued an order requiring that a security of

---

[1] Unless otherwise indicated, the facts described herein are undisputed.  The Court relies primarily on the Underwriters' Response to Plaintiff's Rule 56.1 Statement of Facts ("Underwriters 56.1 CS"), Dkt. No. 110, and Swift's Response to Seascope Policy and B&P Policy Defendants' Joint Rule 56.1 Statement of Undisputed Facts ("Swift 56.1 CS"), Dkt. No. 122.

2.0 million Libyan Dinar (about $1.6 million) be posted to secure the release of the Swift Spindrift. Underwriters 56.1 CS ¶ 10.

How the ensuing legal proceeding in Libya unfolded is the subject of considerable dispute. According to Swift, the Libyan Court indicated that it would accept an irrevocable letter of credit as a form of security. Swift Rule 56.1 Statement ¶ 13. The parties agree that on January 20, 2009, Swift posted such a letter, payable to the Importer, in the amount of $1.6 million. Swift 56.1 CS ¶¶ 15, 16. Swift claims that the Libyan Court ordered the release of the Swift Spindrift, but that the vessel remained under arrest after the Libyan Foreign Bank refused to liquidate the letter of credit. Swift Rule 56.1 Statement ¶¶ 17-20. Swift further contends that when it petitioned the court (again) to release the vessel in March 2009, the court summarily denied the request. Id. ¶ 20. The Underwriters, on the other hand, claim that Swift knew all along that the only sure way to secure the release of the Swift Spindrift was to deposit the required security in cash, and that the Importer would have needed to agree to accept an irrevocable letter of credit in order for the letter that Swift posted to be sufficient. Underwriters Rule 56.1 Statement ¶¶ 20, 21. They claim there is no evidence that the Importer ever made such an agreement. Id. ¶ 25.

Irrespective of what was or was not required to secure the vessel's release, the Swift Spindrift remained in Libya for the duration of the proceedings in Libyan court. On April 7, 2009, the Libyan Court awarded the Importer a judgment of 1.5 million Libyan Dinar (about $1.1 million). Underwriters 56.1 CS ¶ 21. Both the Importer and Swift appealed the court's judgment. Swift 56.1 CS ¶ 37. In January 2010, the appeals court reduced the judgment to 1.1 million Libyan Dinar, which Swift subsequently paid. Id. ¶¶ 39, 40. On June 3, 2010, Swift again petitioned the Libyan Court to order the release of the Swift Spindrift, and the court granted the request on June 21, 2010. Underwriters CS ¶ 26. On June 17, 2010, Swift sold the Swift Spindrift on an "as-is, where-is" basis for $2,299,000 to a third party. Id. ¶ 27. By that point, the Swift Spindrift had been under arrest in Libya for more than eighteen months. Id. ¶ 26.

### B.     The Insurance Policies and Claims

The Swift Spindrift was covered by two different insurance policies during the course of the events described above, with Swift named as the insured.  The group of underwriters known as the Seascope Defendants subscribed to the "Seascope Policy," which insured the Swift Spindrift from November 1, 2008, until the policy was terminated on December 31, 2008. Underwriters 56.1 CS ¶¶ 39, 43; *see also* Chalos Decl., Dkt. No. 100, Ex. D ("Seascope Policy"). A second group of underwriters—the B&P Defendants—subscribed to the "B&P Policy," which provided coverage for the Swift Spindrift from January 1, 2009, to December 31, 2009. Underwriters 56.1 CS ¶ 55; *see also* Chalos Decl., Dkt. No. 100, Ex. H ("B&P Policy"). Gallagher served as Swift's broker when Swift purchased the B&P Policy.  Swift 56.1 CS ¶ 7.[2]

Both the Seascope Policy and the B&P Policy (together, "the Policies") were "agreed value" policies, meaning that in the event of a covered total loss or constructive total loss, the Policies would pay Swift an agreed amount for the Swift Spindrift.  Underwriters 56.1 CS ¶¶ 49, 64.  The agreed value of the Swift Spindrift under the Seascope Policy was $9,900,000, and the agreed value was $9,281,250 under the B&P Policy.  *Id.*  Both policies included a provision that allowed Swift to claim the Swift Spindrift as a constructive total loss if the vessel were subject to a covered "arrest" lasting more than six months.  *Id.* ¶¶ 45, 46, 65, 66.  On August 6, 2009— more than eight months after the Swift Spindrift had been served with legal process in Tripoli— Swift notified the B&P Defendants that it was claiming a constructive total loss of the vessel under the B&P Policy.  *Id.* ¶ 76.  The B&P Defendants declined Swift's Notice of Abandonment. *Id.* ¶ 77.  Two weeks later, Swift notified the Seascope Defendants that it was claiming a constructive total loss under the Seascope Policy.  *Id.* ¶ 78.  Seascope likewise rejected Swift's Notice of Abandonment.  *Id.* ¶ 79.

---

[2] The Underwriters do not contest that the B&P Policy *purported* to be in effect from January 1, 2009, through December 31, 2009, but they argue that the B&P Policy never actually took effect because of a nondisclosure on the part of Gallagher.  Underwriters 56.1 CS ¶ 55.  The Court need not resolve that issue because, as explained *infra*, Swift cannot recover even if the B&P Policy did take effect.

### C.   Procedural History

Swift filed suit against the Seascope Defendants and the B&P Defendants in November 2009, invoking the Court's admiralty jurisdiction. Compl., Dkt. No. 1, ¶ 1. Swift alleged that the Underwriters had breached their respective insurance contracts because the detention of the Swift Spindrift in Libya, which lasted for more than six months, was a covered peril under the Policies. *Id.* ¶¶ 60, 61, 90, 91. Swift sought the agreed value of the Swift Spindrift under each policy, as well as "sue and labor expenses," i.e., the costs of defending, safeguarding, and eventually earning the release of the vessel, in the amount of nearly $4 million. *Id.* at 24-25. In 2011, Swift amended its complaint to add Gallagher as a defendant and to reduce the damages it was seeking in light of the $2,299,000 it received when it sold the Swift Spindrift in June 2010. Amended Compl., Dkt. No. 21, ¶¶ 38, 64, 95.[3] The parties engaged in an extended period of discovery, and on July 24, 2013, Magistrate Judge Maas granted in part and denied in part Defendants' motion to compel Swift to produce certain documents that it had withheld on the basis of attorney-client privilege. *See Swift Spindrift, Ltd. v. Alvada Ins., Inc.*, No. 09-CV-9342 (AJN) (FM), 2013 WL 3815970 (S.D.N.Y. July 24, 2013).

On May 29, 2015, Swift, the Underwriters, and Gallagher each moved separately for summary judgment. Dkt. Nos. 93, 99, 103.[4] Swift seeks summary judgment with respect to its claims that the Underwriters are liable for the agreed value of the Swift Spindrift and for sue and labor expenses under the terms of the Policies. Swift Br. 1 n.1. It does not seek summary judgment with respect to the specific amount of sue and labor expenses. *Id.* The Underwriters move for summary judgment on the basis that Swift cannot recover under either of the Policies. Underwriters Br. 2. Gallagher moves for summary judgment on the grounds that the B&P

---

[3] Swift's claims against Gallagher are pleaded in the alternative, in the event the Court concludes that the B&P Policy is not valid. *See* Amended Compl. ¶¶ 114-44; *see also* Swift Br. in Opp. to Gallagher MSJ at 2.

[4] Throughout this opinion, the Court relies primarily on the briefing relating to Swift's motion and the Underwriters' motion. Accordingly, "Swift Br." refers to the brief submitted by Swift in support of its motion for summary judgment, and "Underwriters Br." refers to the brief submitted by the Underwriters in support of their motion. Similarly, "Swift Opp. Br." refers to Swift's opposition to the Underwriters' motion, "Swift Reply Br." refers to Swift's reply brief in support of its motion, "Underwriters Opp. Br." refers to the Underwriters' opposition to Swift's motion, and "Underwriters Reply Br." refers to the Underwriters' reply brief in support of their motion.

Defendants' non-disclosure defense is invalid and, in the alternative, on the grounds that Swift's claims against Gallagher should nonetheless be dismissed. Gallagher Br. in Supp. of MSJ at 1-3.[5] Additionally, Swift filed a motion to exclude Defendants' expert, Dr. Mohamed Karbal. Dkt. No. 96. All four motions were fully briefed as of June 29, 2015.[6]

## II.   LEGAL STANDARD

Summary judgment is appropriate when, after reviewing the parties' submissions in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Generally, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). But when the nonmoving party would bear the burden of proof at trial, "it ordinarily is sufficient for the movant to point to a lack of evidence" supporting the nonmovant's claim. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). If "the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted); *see also Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011) ("[T]he non-moving party cannot rely

---

[5] Swift has joined Gallagher's motion with respect to the claim that the non-disclosure defense is invalid, but has cross-moved for summary judgment on its claims against Gallagher (i.e., the claims that are pleaded in the alternative). Swift Br. in Opp. to Gallagher MSJ at 1.

[6] Swift filed a "Supplemental Memorandum of Law" on October 2, 2015, which the Court struck from the docket as an unauthorized sur-reply brief. *See* Dkt. No. 138. The Court has not considered the supplemental brief in resolving the summary judgment motions.

on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

## III.   DISCUSSION

The central question in this case is whether the Swift Spindrift was subject to an "arrest" that was covered under either the Seascope Policy or the B&P Policy (or both).  Swift puts forward two theories as to why the answer to that question is "yes."  First, Swift contends that both policies cover "commercial" arrests, i.e., arrests that are the result of legal proceedings brought by private commercial parties.  Second, Swift argues that even if the policies cover only "non-commercial" or "governmental" arrests, the events in Libya were nonetheless covered because the arrest of the Swift Spindrift was an exercise of sovereign authority, not a standard commercial arrest.  The Court disagrees on both counts.  For the reasons that follow, the court holds that the Policies do not cover commercial arrests.  Moreover, the Court holds that no reasonable jury could decide that the arrest of the Swift Spindrift was an exercise of sovereign authority.  Accordingly, summary judgment in favor of the Underwriters is appropriate.

Before explaining the resolution of those substantive issues, the Court first turns to the question of what law to apply in interpreting the Policies.

### A.   Applicability of New York Law

The Seascope Policy and the B&P Policy include virtually identical choice-of-law clauses, each titled "Law & Practice Clause," which provide:  "In the event of the Insured exercising the option under this clause it is hereby noted and agreed that New York Law Practice and Jurisdiction shall apply notwithstanding any other provisions contained in this insurance." Seascope Policy at 24 of 25; Chalos Decl., Dkt. No. 100, Ex. BB ("B&P Underwriters' Slip") at 21 of 27.  Swift referenced the choice-of-law clauses in its complaint, *see* Amended Compl. ¶¶ 20, 37, and argues here that New York law applies to the interpretation of the Policies.  The Underwriters address the choice of law issue only in their reply brief, arguing that because "Plaintiff brought suit in this Court and invoked admiralty jurisdiction," Swift "did not exercise

the *option* of 'New York Law Practice and Jurisdiction.'" Underwriters Reply Br. 4 n.2

(emphasis added).  Assuming *arguendo* that the Underwriters did not waive the choice of law

issue by failing to address it in their opposition to Swift's Motion for Summary Judgment, the

Court agrees with Swift that New York law applies to the interpretation of the Policies.

In deciding whether to enforce a choice-of-law clause, "[a] federal court sitting in

admiralty must apply federal choice of law rules." *State Trading Corp. of India v.

Assuranceforeningen Skuld*, 921 F.2d 409, 414 (2d Cir. 1990).  "Under federal choice-of-law

rules, when a maritime contract contains a choice-of-law clause, the law chosen by the parties

governs, unless (1) that jurisdiction has no substantial relationship to the parties or the

transaction or (2) that jurisdiction's law conflicts with the fundamental purposes of maritime

law." *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 127 (S.D.N.Y.

1997) (internal quotation marks and citations omitted), *aff'd sub nom. Farrell Lines Inc. v. Ceres

Terminals Inc.*, 161 F.3d 115 (2d Cir. 1998).  Neither party has argued that either exception

applies here.  Rather, the Underwriters appear to suggest that, because Swift did not bring the

case in New York state court, it cannot invoke New York law.  The Underwriters cite no

authority for this proposition, and the Court has found none.  Accordingly, the Court will apply

New York law to interpret the Policies.[7]

Under New York law, "the initial interpretation of a contract is a matter of law for the

court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.

1996) (internal quotation marks and citation omitted).  If the parties dispute the meaning of "the

terms of an insurance contract, New York insurance law provides that 'an insurance contract is

interpreted to give effect to the intent of the parties as expressed in the clear language of the

---

[7] Even if the Court were to apply federal maritime law in place of New York law, the result in this case would not be different.  In the absence of a choice-of law clause, "[m]arine insurance contracts are governed by federal admiralty law when there is an established federal rule, and by state law when there is not." *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 305 (2d Cir. 1987)." But "[t]here is no established federal admiralty rule that governs the construction of maritime insurance contracts." *Thomas v. NASL Corp.*, No. 99-CV-11901(JGK), 2000 WL 1725011, at *7 (S.D.N.Y. Nov. 20, 2000) (citing *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir. 1999)).  Accordingly, the construction of the marine insurance policies at issue here would be governed by New York law anyway.

8

contract.'" *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)).  In assessing the intent of the parties, a court must first make a threshold determination as to "whether the terms of the insurance contract are ambiguous." *Morgan Stanley*, 225 F.3d at 275.  When an insurance contract's provisions "are unambiguous and understandable, courts are to enforce them as written." *Parks Real Estate*, 472 F.3d at 42.  But if a court determines "that an insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Morgan Stanley*, 225 F.3d at 275-76 (internal quotation marks and citation omitted).  If, after considering this evidence, "the extrinsic evidence does not yield a conclusive answer as to the parties' intent, a court may apply other rules of contract construction, including the rule of *contra proferentem*, which generally provides that where an insurer drafts a policy any ambiguity in the policy should be resolved in favor of the insured." *Id.* at 276 (internal quotation marks, citation, and alterations omitted).

"An ambiguity exists" in an insurance contract "where the terms . . . could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley*, 225 F.3d at 275 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).  In assessing whether an ambiguity exists in a marine insurance contract, a court must "consider . . . custom and usage evidence." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87 n.4 (2d Cir. 2002).  New York courts interpret marine insurance policies "according to the custom and usage of the maritime industry so as to provide a uniformity of case law, since harmonious decisions in this field are deemed highly desirable." *Levitt v. Those Certain Underwriters at Lloyd's*, No. 13248/96, 1999 WL 33116421 (N.Y. Sup. Ct. Aug. 31, 1999) (internal quotation marks omitted) (quoting *Aqua Craft I, Inc. v. Boston Old Colony Ins. Co.*, 518 N.Y.S.2d 863, 867 (N.Y. Sup. Ct. 1987)); *see also Antilles S.S. Co. v. Members of Am.*

*Hull Ins. Syndicate*, 733 F.2d 195, 198 (2d Cir. 1984) (explaining that, in the absence of New York precedent, "the maritime nature of this insurance contract dictates that we anticipate that New York courts would look to English law in view of the 'special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business'" (quoting *Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co.*, 263 U.S. 487, 493 (1924) (Holmes, J.))).

    **B.**    **The Meaning of "Arrest" in the Policies**

    Swift's principal contention is that the "arrests" covered under both policies include commercial arrests. To evaluate this claim, the Court must first determine whether "a reasonably intelligent person who has examined the context of the [Policies] and who is cognizant of the customs, practices, usages and terminology as generally understood in the [marine insurance industry]" would find the use of the term "arrest" in the Policies to be ambiguous. *Morgan Stanley*, 225 F.3d at 275. While resolving that question should, in theory, be a straightforward undertaking, several factors combine to make the answer (and thus the ensuing analysis) complex. First, the term "arrest" appears in several different clauses in each policy, and Swift argues that many of these clauses provide an independent basis for holding that the Policies cover commercial arrests. Second, the clauses containing the word "arrest" are in turn part of standard marine insurance forms that, when read together (as they must be), create a messy patchwork of coverage and exclusions. Third, the language in these marine insurance forms is dated and opaque, and many of the terms have developed a particular meaning in the marine insurance industry over the centuries that the language from these forms has been in use. Accordingly, the Court begins its examination of the Policies with an overview of how the key insurance forms and the clauses contained therein fit together. After providing that context, the Court analyzes each of the clauses that provide coverage for "arrests" and reaches the same conclusion: the clauses unambiguously do *not* cover commercial arrests.

    **1.**    **Overview of the Policies**

    The starting point for analyzing both the Seascope Policy and the B&P Policy is the American Institute Hull Clauses, dated June 2, 1977 ("Hull Clauses"). Each policy contains the

Hull Clauses, Underwriters 56.1 CS ¶ 38, which are familiar in the marine insurance industry as "[t]he most important U.S. form of hull coverage." 8 Benedict on Admiralty § 12.07 (Joshua S. Force ed., 7th ed. 2014). The key coverage provision in the Hull Clauses is the "Perils Clause," which purports to cover a long—and arcanely worded—list of perils. Specifically, it provides:

> Touching the Adventures and perils which the Underwriters are contented to bear and take upon themselves, they are of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the Vessel, or any part thereof, excepting, however, such of the foregoing perils as may be excluded by provisions elsewhere in the Policy or by endorsement thereon.

Underwriters 56.1 CS ¶ 38.

The phrase from the Perils Clause that is the focus of this case is "Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever," and that phrase is discussed in greater depth below. For now, it is important to note that just because a particular risk appears in the Perils Clause does not mean that it is actually covered under the Hull Clauses. That is because the Hull Clauses also contain a list of "War Strikes and Related Exclusions" (the "War Exclusions Clause"), which exclude a sizeable chunk of the perils from coverage. *See* Chalos Decl., Dkt. No. 100, Ex. Z at 5; B&P Policy at 20. For instance, the War Exclusions Clause provides that the Hull Clauses "do[] not cover any loss, damage or expense caused by . . . arrest, restraint or detainment." *Id.* That may seem strange, given that the Perils Clause expressly *includes* coverage for "Arrests, Restraints and Detainments of all Kings, Princes and Peoples." But the understanding in the marine insurance business is that "[t]he perils clause in the ordinary marine policy does not mean what it says." Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty 72 (2d ed. 1975). Rather, it "covers only those risks which are not knocked out by the [War Exclusions] clause." *Id.*

Typically, to receive coverage for the risks that are "knocked out" by the War Exclusions Clause, a party covered by the Hull Clauses must purchase separate war risk insurance. *See*

Robert T. Lemon II, *Allocation of Marine Risks: An Overview of the Marine Insurance Package*, 81 Tul. L. Rev. 1467, 1469-70 (2007) (noting that although "[t]he hull policy's principal property cover is found in the 'perils clause,'" coverage for certain of these perils "is subsequently excluded . . . thereby requiring the assured to obtain separate 'war risks' insurance in order to maintain insurance protection against those perils"). Both policies at issue here include standard war risk insurance forms. The Seascope Policy contains the American Institute Hull War Risks and Strikes Clauses, dated December 1, 1977.[8] Seascope Policy at 8 of 25. These clauses "cover[] only those risks which would be covered by the attached Policy . . . in the absence of the War, Strikes and Related Exclusions clause." American Institute of Marine Underwriters, Hull War Risks and Strikes Clauses (Dec. 1, 1977) ("1977 War Risks and Strikes Clauses"). In other words, the 1977 War Risks and Strikes Clauses essentially restore coverage for the risks that would be covered under the Perils Clause were it not for the War Exclusions Clause. Thus, an "arrest" that is covered by the Perils Clause, and subsequently excluded from coverage by the War Exclusions Clause, could be restored to coverage through the 1977 War Risks and Strikes Clauses.

The B&P Policy contains a modernized version of these war risk clauses—the American Hull Insurance Syndicate Hull War Risks and Strikes Clauses, dated March 19, 2002 ("2002 War Risks and Strikes Clauses"). B&P Policy at 26. Although the 2002 War Risks and Strikes Clauses contain slightly different language from their 1977 counterpart (differences that are discussed in greater depth below), at a high level the Clauses function in a similar manner by providing coverage for many of the perils that are excluded from the Hull Clauses by the War Exclusions Clause. *Id.* For instance, the 2002 War Risks and Strikes Clauses specifically restore coverage for "[c]apture, seizure, arrest, restraint, detainment, confiscation or expropriation." *Id.*

---

[8] Although the December 1, 1977 War Risks and Strikes Clauses are the very first coverage provision mentioned under the heading "WAR ETC RISKS" in the "Evidence of Cover" for the Seascope Policy, the Evidence of Cover does not contain a copy of the Clauses. *See* Seascope Policy at 8 of 25. That appears to be because the Evidence of Cover provides that "various Institute and/or other clauses referred to in this documentation may not have been specifically attached." *Id.* at 3 of 25. A copy of the December 1, 1977 War Risks and Strikes Clauses is available at www.aimu.org/forms/87B-108.pdf.

To summarize the ground covered thus far: The Hull Clauses contain a Perils Clause, which purports to cover a certain set of risks.  But the Hull Clauses also contain a War Exclusions Clause, which excludes many of those same risks from coverage.  The War Risks and Strikes Clauses—both the 1977 and 2002 versions—then restore coverage to most of those excluded risks.

Making matters more complicated, there are several additional clauses that modify or supplement the standard insurance forms discussed above.  In both policies, the War Risks and Strikes Clauses are modified by the Addendum to American Institute Hull War Risks and Strikes Clauses, dated April 1, 1984 (the "1984 Addendum").  Underwriters 56.1 CS ¶¶ 45, 65.  The 1984 Addendum slightly alters the risks and exclusions mentioned in the War Risks and Strikes Clauses.  It also includes two provisions that clarify when a vessel becomes a "constructive Total Loss" in the event of a covered "capture, seizure, arrest, restraint, detainment, confiscation or expropriation."  *Id.*  Finally, the B&P Policy includes a Blocking and Trapping Clause that potentially affects the scope of the arrests covered under that policy.  *See* B&P Policy at 32.

### 2.    Specific Policy Provisions at Issue

With that framework for interpreting the Policies established, the Court considers in turn each clause that could potentially provide coverage for commercial arrests.

### i.    The Perils Clause

The natural starting point for analyzing the meaning of "arrests" is the Perils Clause, which, as explained above, is contained in the Hull Clauses that are incorporated into both the Seascope Policy and the B&P Policy.  To be sure, the preceding overview to the Policies makes clear that if an "arrest" is *initially* covered under the Perils Clause, it may subsequently be excluded from coverage by the War Exclusions Clause, which lists "arrest" as one of the excluded perils.[9]  But understanding which arrests are covered under the Perils Clause is a

_____

[9] Neither party grapples with the question of whether there is a category of arrests that could be covered under the Perils Clause but *not* subsequently excluded by the War Exclusions Clause.  That fact is particularly striking on Swift's part, given the emphasis it places on the Perils Clause as a source of coverage for commercial

necessary first step in gauging whether any of the subsequent clauses in the Policies cover commercial arrests.

As outlined above, the Perils Clause provides as follows:

> Touching the Adventures and perils which the Underwriters are contented to bear and take upon themselves, they are of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the Vessel, or any part thereof, excepting, however, such of the foregoing perils as may be excluded by provisions elsewhere in the Policy or by endorsement thereon.

Underwriters 56.1 CS ¶ 38. And again, the portion of the Perils Clause at issue in this case is the part that covers "Arrests, Restraints and Detainments of all Kings, Princes, and Peoples, of what nation, condition or quality soever." Swift argues that the word "Arrests" is not qualified by the phrase "of all Kings, Princes and Peoples," and that the Perils Clause therefore covers "commercial" arrests, in addition to "governmental" arrests. Swift Br. 10. The Underwriters, by contrast, contend that the perils of "Arrests, Restraints and Detainments" are each modified by the phrase "of all Kings, Princes and Peoples," and that the term "Arrests" thus refers "only to sovereign acts committed in a sovereign capacity." Underwriters Opp. Br. 1. The Court concludes that the Underwriters put forward the correct reading of the Perils Clause.

Swift relies primarily on the syntactical structure of the Perils Clause to support its interpretation. It notes that the perils listed in the Clause are generally separated by commas; that the phrase "of all Kings, Princes and Peoples" cannot modify *all* of the preceding perils in the clause (an "Earthquake . . . of all Kings" would not make sense); and so the best reading of the Clause is that the phrase "of all Kings, Princes and Peoples" modifies only the preceding peril—i.e. "Detainments"—and perhaps "Restraints," which is not separated from "Detainments" by a comma. Swift Br. 10-11. In other words, because the peril of "Arrests," like the perils of

---

arrests. Regardless of whether such a category of arrests exists, however, the Court concludes that the Perils Clause does not cover commercial arrests.

"Earthquake" and "Fire," does not immediately precede the phrase requiring the peril to be "of all Kings, Princes and Peoples," that phrase should not be read as limiting the kinds of "Arrests" covered under the Perils Clause. Without such limits, Swift argues, the "plain, ordinary meaning" of "arrest" would cover "the facts and circumstances under which the Swift Spindrift was arrested in this case." *Id.* at 12.

If the Court were permitted to interpret the Perils Clause in a vacuum, Swift's argument might have some appeal. On the one hand, Swift is correct that the use of commas in the clause suggests that "of all Kings, Princes and Peoples" only modifies the immediately preceding peril—otherwise there is no clear way to know how far back into the list of risks covered by the Perils Clause the phrase has effect. And if the word "Arrests" stands alone, then it likely applies to the detention of the Swift Spindrift. *See Arrest*, Black's Law Dictionary (10th ed. 2014) (defining "arrest" in the context of maritime law as "[t]he taking of a ship and sometimes its cargo into custody by virtue of a court's warrant"). On the other hand, arrests, restraints, and detainments are all similar perils, and it would make sense that the Perils Clause qualifies each of them with a phrase that indicates what actor must do the arresting, restraining, or detaining. In short, without additional context, the meaning of "Arrests" in the Perils Clause could be deemed ambiguous.

But the Court may not ignore relevant context in determining whether the Perils Clause is ambiguous. Rather, it must adopt the perspective of "a reasonably intelligent person . . . *who is cognizant of the customs, practices, usages and terminology* as generally understood in" the marine insurance industry. *Morgan Stanley*, 225 F.3d at 275 (emphasis added). Adopting that perspective requires examining "custom and usage evidence" that bears on "whether an ambiguity [in the clause] exists." *Int'l Multifoods*, 309 F.3d at 87 n.4; *see also Antilles*, 733 F.2d at 201 (explaining that "[t]he language used in the subject marine policy consists of certain words of art and phrases that over generations have acquired content and meaning, revealed through an examination of customs and practices in the field of marine insurance," and that "knowledgeable parties" should "be presumed to have intended that [the policy's] terms be

15

applied in accordance with such general understanding, absent an indication of contrary intent"). Here, the terminology and phrasing in the Perils Clause has been used in marine insurance contracts for centuries. And an understanding of that history compels the conclusion that a reasonably intelligent person would find that the Perils Clause unambiguously requires any covered "Arrests" to be "of Kings, Princes and Peoples."

The wording of the Perils Clause dates back to at least the late 1700s, when the Lloyd's SG clause covered an almost identical set of risks, with nearly identical wording. *See* Graydon S. Starring, *Admiralty and Maritime Law: Selected Topics*, 26 Tort & Ins. L.J. 538, 540 (1991) (noting that Lloyd's "dominated marine insurance in the 18th and 19th centuries," and that "[t]he famous SG clause [was] common to Lloyd's marine policies from 1779 until 1983").[10] The similarity between the language in the SG Clause and the Perils Clause is not a coincidence. "The American Institute of Marine Underwriters has long sponsored American Institute clauses," like the Hull Clauses at issue here, "as standards for reference in the United States." *Id.* at 541. Those clauses "usually provide the same coverage as the London clauses and differ principally in the 'Americanization' of some of their terms and syntax." *Id.*; *see also* Sheldon A. Vogel, *The Hull Policy: The Perils and Held Covered Clauses*, 41 Tul. L. Rev. 259, 259 (1967) ("The so-called 'perils' clause of the American Institute Time (Hulls) January 1, 1964, (AITH) policy," a predecessor to the Hull Clauses at issue here, "has changed little from the form in use in the nineteenth century.").

For about as long as the language of the Perils Clause has been in use, courts and commentators have recognized that its phrasing makes deciphering the risks covered a difficult

---

[10] The full text of the Lloyd's SG clause read: "Touching the adventures and perils which we the assurers are contented to bear and do take upon us in this voyage; they are of the seas, men-of-war, fire, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, surprisals, takings at sea, arrests, restraints, and detainments of all kings, princes and people, of what nation, condition or quality soever, barratry of the master and mariners, and of all other perils, losses, and misfortunes, that have or shall come to the hurt, detriment, or damage of the said goods and merchandises, and ship, etc., or any part thereof." Starring, *supra*, at 540. The only differences between the SG Clause and the Perils Clause in terms of the risks covered are that the Perils Clause covers "lightning" and "earthquake" (in addition to "fire"), and that the Perils Clause uses the term "assailing thieves" where the SG Clause uses "thieves."

proposition. *See* 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 19-10 (5th ed. 2011) (quoting a 1791 case that "described the [Lloyd's] S.G. Policy as an 'absurd and incoherent instrument'"); *see also* William D. Winter, Marine Insurance: Its Principles and Practice 140 (1919) ("Read without reference to the wealth of legal lore referring to this particular part of the policy [i.e., the 'Perils' clause], the document is vague, misleading and perhaps unintelligible."). Fortunately, however, "practically every word in the paragraph has been weighed in the judicial balance and its own meaning and its meaning in relation to the context has been determined." Winter, *supra*, at 140.

Turning to that established meaning, the Perils Clause has always been read to require that any covered "arrests, restraints and detainments" be "of kings, princes and peoples." In an 1810 insurance treatise, Samuel Marshall analyzed the meaning of each phrase in what is now the Perils Clause, including the "arrests, restraints, and detainments" language at issue here. *See* *2* Samuel Marshall, A Treatise on the Law of Insurance 485 (J.W. Condy ed., 1810) (noting that "[i]n our common policies [the perils] are set forth in the following words. 'Touching the adventures and perils which we the assurers are content to bear . . . they are of the seas . . . surprizals [sic], takings at sea, arrests, restraints, and detainments of all kings, princes, and people, of what nation, condition, or quality soever . . ."). In the section specifically dedicated to analyzing a "Loss by Detention of Princes," Marshall explained that "[b]y the terms of the policy the insurer is answerable for all loss occasioned by 'arrests or detainments of all kings, princes, and people, of what nation, condition, or quality soever.'" *Id.* at 506. Marshal further clarified that "[u]nder these words, which are nearly the same in the policies of all the other maritime countries of Europe, the insurers are liable for losses occasioned by arrests or detention of the ship or goods insured, *by the authority of any prince*, *or public body claiming to exercise sovereign power*, under what pretence soever." *Id.* at 506-07 (emphasis added).

American courts have taken a similar approach when interpreting the language now found in the Perils Clause. In *McCall v. Marine Insurance Co.*, 12 U.S. (8 Cranch) 59 (1814), the Supreme Court analyzed a marine insurance policy that "contained the usual risks," but with

17

one difference: "that the word '*unlawful*,' was printed before '*arrests*,' so that the clause stood, '*unlawful arrests, restraints, and detainments of all kings, princes, or people of what nation, condition or quality soever*.'" *Id.* at 60 (emphasis in original).  Although the focus of the Court's analysis in *McCall* was on the effect that the word "unlawful" had on the meaning of the policy, the Court also made clear that "'arrests, &c. of all kings, princes, and people,' . . . have *always* been held to mean the arrests of kings, princes, or people, in their sovereign and national capacity." *Id.* at 66 (emphasis added).  Swift argues that because the Court concentrated its attention on the meaning of the word "unlawful," *McCall* should be read only as a case about the effect that qualifying language has on "subsequent words," i.e., whether "unlawful" modifies the subsequent phrase, and "not antecedent words," i.e., whether "of all kings, princes, and people" modifies the antecedent phrase.  Swift Reply Br. 3.  While the effect of the word "unlawful" was indeed the issue the Court needed to resolve in *McCall*, Swift's argument ignores the fact that more than 200 years ago the Supreme Court was already reading the word "arrests" in standard marine insurance contracts as qualified by "of all kings, princes, and peoples."

Courts have not deviated from that understanding.  *See, e.g.*, *Reinold v. United States*, 167 F.2d 556, 558 (2d Cir. 1948) (citing maritime treatise for the proposition that "there is no significant distinction between 'arrests, restraints and detainments'" and observing that "these terms include[] only such types as embargoes, blockades and seizures in which a *government* assumes general control over the movements of a vessel" (emphasis added)); *Dole v. New England Mut. Marine Ins Co*, 7 F. Cas. 837, 845 (C.C.D. Mass. 1864) (No. 3,966) (noting that the plaintiff's authorities "show that the words 'arrests, restraints, and detainments of kings, princes, and people, of what nation or quality soever,' as a general rule, apply only to the acts of nations in their collective capacity").  A modern insurance treatise reaches the same conclusion, analyzing the perils of arrest, restraint, and detainment together.  *See* 9A Steven Plitt, et al., Couch on Insurance § 137:53 (3d ed. 2005).  The treatise reaffirms that "[t]he arrests and detentions clause applies to actions by the commissioned agents of a lawful government." *Id.* § 137:55.

18

Swift cites no authority suggesting that the "arrests" covered under the Perils Clause have ever been read to include those that were *not* "of kings, princes, and peoples." This lack of authority is striking, given that the language from the Perils Clause has been included in marine insurance contracts for hundreds of years. Swift protests that the Underwriters rely principally on authorities that interpret maritime law as it existed "decades or centuries ago" and that do not address "[t]he specific insurance clauses at issue here." Swift Reply Br. 1. But it is precisely *because* the language from these clauses has stayed the same for decades and centuries that it is important to take stock of the consensus as to their meaning. Swift would have the Court create ambiguity where none has existed, but a reasonably intelligent person in the marine insurance industry would decline that invitation. *See Morgan Stanley*, 225 F.3d at 275. The Court will as well.

Accordingly, the Court holds that the Perils Clause unambiguously covers "arrests" that are only of "of all kings, princes, and peoples." As such, the Perils Clause does not cover commercial arrests. Swift does not dispute that the phrase "kings, princes, and peoples" requires a "governmental act[]." Swift Reply Br. 5 n.6; *see also* Plitt, *supra*, § 137:55 ("The phrase 'kings, princes, and people' is interpreted as requiring official governmental action."). And the authority is unanimous that "kings, princes, and people" refers only to governmental acts that take the form of an exercise of sovereign power, thereby excluding the detainment of a ship pursuant to private commercial litigation. For instance, in *Bradlie v. Maryland Insurance Co.*, 37 U.S. (12 Pet.) 378 (1838), the Supreme Court held that the detention of a ship "under . . . admiralty proceedings" was not covered by a clause "respecting 'restraints and detainments of all kings, princes or people.'" *Id.* at 402. The Court explained that "the restraints and detainments there alluded to[] are the operations of the sovereign power by an exercise of the vis major, in its sovereign capacity . . . and not proceedings of a mere civil nature to enforce private rights." *Id.*; *see also* David D. Hallock, Jr., *Recent Developments in Marine Hull Insurance: Charting a Course Through the Coastal States of the Fourth, Fifth, Ninth, and Eleventh Circuits*, 10 U.S.F. Mar. L.J. 277, 291 (1998) ("Maritime law defines 'arrests, restraints, and detainments

19

of all kings, princes and people' as a taking by a sovereign.  This peril does not include coverage for civil arrests."); Harry L. Haehl, Jr., *The Hull Policy: Coverages and Exclusions Frequently Employed*, 41 Tul. L. Rev. 277, 296 (1967) ("Detention of a vessel by admiralty or other court process is considered a civil rather than sovereign exercise of power and so outside these terms."); 2A Michael F. Sturley, Benedict on Admiralty § 154 (Joshua S. Force ed., 7th ed. 2015) ("Detention in quarantine is by restraint of princes, but not detention by legal proceedings brought by private parties.").

Swift contends that *Bradlie* is inapposite because the policy language at issue in that case "is very different from the coverage provisions in the Policies at issue here," which specifically include coverage for "arrests."  Swift Reply Br. 4.  This argument misses the mark.  *Bradlie* does not purport to interpret the meaning of "arrests," but rather clarifies the meaning of "kings, princes, or people."  Swift makes no argument as to the meaning of *that* phrase; it simply reasserts its argument that "the word 'arrest' . . . is not qualified in any manner" here, and relies on that fact as the basis for distinguishing contrary authority.  *Id.* at 4-5 & n.6.  But given that the Court has already held that the word "arrest" *is* qualified by the "kings, princes, and peoples" language, the interpretation of that phrase in similar contexts is relevant to the determination of its meaning.  Given that authorities uniformly interpret that language as requiring an exercise of sovereign authority, the Court holds that a commercial arrest unambiguously is *not* an arrest "of all kings, princes, and peoples."

Swift's final argument against this reading of the Perils Clause is that New York law is particularly hostile to attempts to negate coverage by virtue of an alleged exclusion.  Swift Br. 13 (citing *Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y.*, 671 N.Y.S.2d 66 (N.Y. App. Div. 1998)).  This characterization of New York law is accurate, but irrelevant.  The Court's holding regarding the Perils Clause does not pertain to an exclusion, but rather to a grant of coverage in the first place.  In order "[t]o negate coverage by virtue of an exclusion," there must first be "a presumptively covered loss."  *Throgs Neck Bagels*, 671 N.Y.S.2d at 71.  Here, a commercial

arrest is not "a presumptively covered loss" under the Perils Clause because it is not an arrest of kings, princes, or peoples.  There is thus no need to apply New York's rule regarding exclusions.

### ii.      War Risks and Strikes Clauses

The second possible source of coverage for commercial arrests is the War Risks and Strikes Clauses contained in each policy.  As explained above, the Policies contain different versions of these clauses—the Seascope Policy contains the 1977 version, and the B&P Policy contains the 2002 version.  The Court discusses each in turn and concludes that neither version covers commercial arrests.

The 1977 War Risks and Strikes Clauses do not grant coverage for arrests expressly. But they do cover "those risks which would be covered . . . in the absence of the War, Strikes and Related Exclusions clause," i.e., the "War Exclusions Clause" that is contained in the Hull Clauses.  *See* 1977 War Risks and Strikes Clauses.  The perils excluded by the War Exclusions Clause include: "Capture, seizure, arrest, restraint or detainment, or any attempt threat."  Chalos Decl., Dkt. No. 100, Ex. Z at 5.  The 1977 War Risks and Strikes Clauses thus restore coverage for those perils, including arrests.  But by *restoring* coverage for arrests, the 1977 War Risks and Strikes Clauses do not expand the category of covered arrests.  Rather, "[t]he War Risks [and Strikes] Clauses cover the risks, and *only the risks*, that are precluded from coverage under a Hull policy by its War, Strikes and Related Exclusions clause."  *O'Donnell-Usen Fisheries v. Bathurst*, 664 F. Supp. 37, 40 (D. Mass. 1987) (emphasis added).  In other words, because the War Exclusions Clause cannot *exclude* from coverage risks that were never covered under the Perils Clause in the first place, the 1977 War Risks and Strikes Clauses can only provide coverage for "arrests" that are covered under the Perils Clause.  But since the Perils Clause does not provide coverage for commercial arrests, the War Exclusions Clause cannot exclude coverage for commercial arrests, and the 1977 War Risks and Strikes Clauses cannot restore coverage for commercial arrests.

The 2002 War Risks and Strikes Clauses proceed somewhat differently.  They begin by noting that "[t]hese Hull War Risks and Strikes Clauses shall be used in conjunction with the

American Institute Hull Clauses, dated June 2, 1977." B&P Policy at 26. The Clauses then explain that they operate in place of "lines 239-255 of the American Institute Hull Clauses," which are the lines that comprise the War Exclusions Clause, and go on to list the "specific additional named perils" that are covered. *Id.* The first subset of risks covered is "Capture, seizure, arrest, restraint, detainment, confiscation or expropriation, or any attempt threat." *Id.* Those risks align exactly with the risks excluded by line 241 of the War Exclusions Clause. *See id.* at 20, 29.[11] The 2002 version of the War Risks and Strikes Clauses therefore functions the same as the 1977 version with respect to arrests: both Clauses restore coverage for the precise risks excluded by the line of the War Exclusions Clause that includes arrests.

Swift acknowledges that the 2002 War Risks and Strikes Clauses "reinstate[]" coverage for the arrests excluded by the War Exclusions Clause. Swift Reply Br. 8. But it argues that these Clauses add "coverage for 'arrests' back into the Polic[y] . . .*without any qualification or limitation*." *Id.* (emphasis added). In other words, Swift suggests that because the word "arrest" is not modified by "of kings, princes and peoples" in the 2002 War Risks and Strikes Clauses, the Clauses must cover *all* manner of arrests. But this argument flies in the face of the structure of the Clauses, which, as explained above, must be read "in conjunction with" the Hull Clauses. The Hull Clauses exclude "arrest, restraint, [and] detainment" from coverage (via the War Exclusions Clause) in the context of a Perils Clause that covers those risks only when they are the result of an exercise of sovereign authority. Yet Swift would have the Court hold that even though the 2002 War Risks and Strikes Clauses use the *identical* language of the War Exclusions Clause, the 2002 War Risks and Strikes Clauses grant coverage to a significantly broader set of perils than the War Exclusions Clause excludes.

Swift's reading makes even less sense when the Court considers, as it must, how the 2002 War Risks and Strikes Clauses would be read by a reasonably intelligent person in the marine

---

[11] Although the 1977 version of the Hull Clauses does not include "confiscation or expropriation" in the War Exclusions Clause, the 1984 Addendum contained in the B&P Policy amends the War Exclusions Clause to include both of those risks. *See* B&P Policy at 29.

insurance industry.  Given that the 2002 War Risks and Strikes Clauses "consist[] of certain

words of art and phrases that over generations have acquired content and meaning," the Court

must presume that the "knowledgeable parties" in this case "intended that [the Clauses'] terms be

applied in accordance with such general understanding." *Antilles*, 733 F.2d at 201.  A party

familiar with the phrases used in standard war risk insurance policies would know that

"[g]enerally the same words are used to describe the war risks excluded or insured." Haehl,

*supra*, at 277-78.  Here, the 2002 War Risks and Strikes Clauses do precisely that—using the

same words to grant war risk coverage that were used to exclude war risk perils under the Hull

Clauses.  Those same words unambiguously share the same meaning, and that meaning does not

encompass commercial arrests.

### iii.    Clause 3 of the 1984 Addendum

The next clause that Swift cites for the proposition that commercial arrests are covered

under the Policies is Clause 3 of the 1984 Addendum.  As explained above, both policies contain

the 1984 Addendum, which modifies the 1977 and 2002 War Risks and Strikes Clauses.  The

relevant language from Clause 3 provides:

> In the event that the Vessel shall have been the subject of capture, seizure, arrest,
> restraint, detainment, confiscation or expropriation, and the Assured, by reason thereof,
> has lost the free use and disposal of the Vessel for a continuous period of [6] months
> (even though condemnation has not occurred), then for the purposes of ascertaining
> whether the Vessel is a constructive Total Loss the Assured shall be deemed to have been
> deprived of the possession of the Vessel without any likelihood of recovery.

Underwriters 56.1 CS ¶ 65.[12]  Swift's argument concerning this clause mirrors its argument

about the 2002 War Risks and Strikes Clauses: unlike in the Perils Clause, the word "arrest" in

the 1984 Addendum is not subject to the qualifier "of kings, princes and peoples." Swift Br. 11.

Thus, Swift contends, the 1984 Addendum covers all manner of arrests, "commercial or

---

[12] As printed in the B&P Policy, the 1984 Addendum requires the Vessel to be subject to the risks described
in Clause 3 for "a continuous period of twelve (12) months," not six months.  B&P Policy at 29.  The time period is
shortened to six months elsewhere in the Policy. *See id.* at 25.  The printed version of the 1984 Addendum in the
Seascope Policy contains no specified time period, but like the B&P Policy, the six-month requirement is imposed
elsewhere.  Seascope Policy at 8 of 25, 23 of 25.

otherwise." *Id.* At the outset then, this argument fails here for the same reason it fails in the context of the 2002 War Risks and Strikes Clauses: the risks of "capture, seizure, arrest, restraint, detainment, confiscation or expropriation" are unambiguously the same risks that are excluded by the War Exclusions Clause and then restored to coverage through both versions of the War Risks and Strikes Clauses. There is no reason for the meaning of those perils to change from clause to clause.

Moreover, the text of Clause 3 makes clear that it is a means of "ascertaining whether the Vessel is a constructive Total Loss," and not a grant of coverage. *See* B&P Policy at 29. Clause 3 clarifies that a vessel can be a constructive total loss, "even though condemnation has not occurred," so long as the vessel has been subject to one of the perils listed in the clause for more than six months. *See id.* at 25, 29. It does not purport to define new categories of perils that could trigger a constructive total loss. The structure of the 1984 Addendum reinforces this conclusion. The first two clauses in the 1984 Addendum clarify that the perils of "confiscation" and "expropriation" are covered under the 1977 War Risks and Strikes Clauses. *See id.* at 29. The Addendum accomplishes this by first amending the War Exclusions Clause in the underlying Hull Clauses to exclude "confiscation or expropriation." *Id.* The Addendum then specifically adds the perils pf "confiscation or expropriation" to the list of perils covered under the 1977 War Risks and Strikes Clauses. *Id.* In other words, when the 1984 Addendum adds coverage for specific perils, it does so by amending particular provisions of the two clauses that form the foundation for war risk coverage: the War Exclusions Clause and the War Risks and Strikes Clauses. Clause 3 of the Addendum does not do that for arrests.

Finally, the Court's reading of Clause 3 is further confirmed by the only named peril whose meaning *is* clarified by the text of the clause: restraint. Clause 3 explains that "'Restraint' as used in this paragraph 3 shall be deemed to include the inability of the Vessel to sail from any port or place to the high seas because of closure of the connecting waterway . . . due to blockage of such waterway caused by hostilities or warlike operations." *Id.* Because Clause 3 provides no

such clarification for the meaning of "arrest," there is no reason to think that the 1984 Addendum changes the kinds of arrests that are covered under the Policies.

iv.      **The Blocking and Trapping Clause**

The last clause that Swift points to as a basis for covering commercial arrests is the Blocking and Trapping Clause contained in the B&P Policy. Swift Br. 17. The relevant portion of that Clause provides: "This insurance will pay the value specified herein in the event of the insured Vessel being unable to sail from any port, place, canal, channel, river, waterway, sea or other areas whatsoever, or any part thereof, by reason of the following," accompanied by a bulleted list of the perils that can trigger coverage under the Clause. B&P Policy at 32. Those perils include "any of the perils excluded by Clauses (a), (c), (d), (e), (g), (h), and (i) of the War Strikes and Related Exclusions Clause contained in the American Institute Hull Clauses June 2, 1977." *Id.* Like the 1977 War Risks and Strikes Clauses, then, the Blocking and Trapping Clause uses the perils excluded by the War Exclusions Clause as a basis for defining what risks are covered. But again, the "arrests" that are excluded by the War Exclusions Clause (in Clause (a)) are, at most, the arrests that are covered under the Perils Clause. And once more, the arrests covered by the Perils Clause do not include commercial arrests.

Swift argues though that coverage for commercial arrests under the Blocking and Trapping Clause stems from the Clause's definition of "unable to sail." Swift Br. 17. The Clause explains that "the term 'unable to sail' includes . . . circumstances under which the Vessel does not sail in consequence of . . . any order, advice or recommendation of any government or local authority." B&P Policy at 32. Swift's claim is that because the Swift Spindrift was arrested pursuant to a court order—which arguably counts as an order of "any government"—the "unable to sail" language of the Blocking and Trapping Clause "avoids the entire issue regarding 'commercial arrests' versus 'government arrests.'" Swift Br. 17. Not so. The Blocking and Trapping Clause does not cover *every* instance in which a vessel is unable to sail. Rather, the Clause covers a vessel that is "unable to sail . . . *by reason of the following* . . . " B&P Policy at 32. There are thus two conditions that need to be satisfied to trigger coverage under the Clause:

25

first, the vessel must meet the Clause's definition of "unable to sail," and second, the reason for the inability to sail must be one of the reasons listed in the Clause. As explained above, the only arrests incorporated into that list are the same arrests excluded by the War Exclusions Clause. The Blocking and Trapping Clause therefore unambiguously does not cover commercial arrests.

\*\*\*

At bottom, all of the policy provisions discussed above rely on the Hull Clauses for the language that Swift claims provides coverage for commercial arrests. The Hull Clauses are either cited directly, by mentioning the War Exclusions Clause, or mimicked with identical phrasing, as with the 2002 War Risks and Strikes Clauses. It makes sense, then, to interpret these interlocking provisions as referencing the same definition of the peril of "arrests." This is particularly true when one considers how long "arrests" have been covered under marine insurance policies and how uniformly those policies have employed the same language at issue here.

Against this historical backdrop, Swift offers not one case, text, treatise, or other source in which a marine insurance policy with the same or similar language to the Policies in this case has been interpreted to cover a commercial arrest. By contrast, every authority this Court has consulted on marine insurance suggests that the perils of arrest, restraint, and detainment are generally grouped together, and that each peril requires the exercise of sovereign power in order to trigger coverage. Accordingly, the Court holds that when "viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement[s] and who is cognizant of the customs, practices, usages and terminology as generally understood in the [marine insurance] business," *Morgan Stanley*, 225 F.3d at 275, the Policies unambiguously do not cover commercial arrests.

## C. Whether the Arrest of the Swift Spindrift was an Exercise of Sovereign Authority

To recover for the constructive total loss of the Swift Spindrift, Swift "has the burden of showing that both the loss and the peril which caused it fall within the meaning of the policy

26

terms." *Antilles*, 733 F.2d at 199. Given that the Policies do not cover commercial arrests, there must be enough admissible evidence for a reasonable jury to conclude that the arrest of the Swift Spindrift was carried out pursuant to an exercise of sovereign authority in order for Swift's claims to survive summary judgment. Swift advances two theories as to why the arrest of the Swift Spindrift meets that standard—that the Importer is a government entity that exercised sovereign power, and that the Libyan Court exercised sovereign power. The Court holds, however, that Swift has failed to point to sufficient admissible evidence to allow a reasonable jury to reach either conclusion.

Swift's contention that the Importer was an instrumentality of the Libyan government rests on the conclusions of a report prepared by its expert, Dr. Diederik Vandewalle, concerning the political, legal, and financial institutions in Libya. *See* Chalos Decl., Dkt. No. 100, Ex. Y ("Vandewalle Report"). Dr. Vandewalle describes the economic system in Libya during the period relevant to this case as one in which all of the country's enterprises were owned by the "masses," through what were called "tasharkiat." *Id.* at 6. He further explains that all of these tasharkiat "depended on one of roughly a dozen state import and export enterprises," which served as "instruments of political control." *Id.* Accordingly, Dr. Vandewalle contends, the Importer (Tasharkiat Green Valley Animal Foods Ltd.) was "either directly or indirectly controlled or owned by the Government of Libya." *Id.* at 11. In light of these conclusions, Swift argues that the actions of the Importer "were effectively the actions of the government of Libya." Swift Br. 20.

The Underwriters contest many of the conclusions in Dr. Vandewalle's report, and they point out that Swift has offered no details about the operations of the Importer and its supposed ties to the Libyan government. Underwriters Opp. Br. 18. But more to the point, the Underwriters argue that even if the Importer were a state-owned or controlled entity, that would not mean it was exercising sovereign power when it filed suit and sought to have the Swift Spindrift arrested. *Id.* The Underwriters rely on *Baker Castor Oil Co. v. Insurance Co. of North America*, a Second Circuit case where the court rejected the plaintiff's contention that a state-

owned entity had effected a "sovereign restraint" by diverting three vessels to the port of New Orleans. 157 F.2d 3, 3-5 (2d Cir. 1946). The entity in question, "Lloyd Brasileiro," was "a department of the government of Brazil and the owner of [the] three vessels" that were the subject of the dispute. *Id.* at 3. The plaintiff had insured the vessels' cargo with a war-risk policy that included coverage for "arrests, restraints and detainments." *Id.* at 4. In rejecting the plaintiff's claim, the court reasoned that "in marine and war risk policies[,] [a] restraint of princes applies only to acts done in the exercise of the sovereign power." *Id.* at 5 (internal quotation marks and citation omitted). Accordingly, it concluded that "[w]hat Lloyd Brasileiro did as a private owner and with regard only to its own ships was not the exercise of any such sovereign power." *Id.*

The logic of *Baker* applies with full force here. Whatever the Importer's relationship to the Libyan government, Swift has put forward no evidence from which a reasonable jury could conclude that its actions *related to this particular case* were in any way an exercise of sovereign power. By Swift's logic, every action of every state-owned entity would constitute an exercise of sovereign authority, but the Second Circuit rejected that position in *Baker*. Moreover, Swift offers no response to the Underwriters' reliance on *Baker* in its reply brief. *See* Swift Reply Br. 9-10. In the absence of any authority to support Swift's far-reaching conception of sovereign power, the Court holds that Swift has pointed to no admissible evidence that the Importer's actions constituted a governmental arrest that would be covered under the Polices.

Similarly, Swift has failed to identify admissible evidence that would allow a reasonable jury to conclude that the Libyan Court exercised sovereign authority in overseeing the arrest of the Swift Spindrift. As explained previously, sovereign authority does not encompass "proceedings of a mere civil nature to enforce private rights." *Bradlie*, 37 U.S. (12 Pet.) at 402. Swift must therefore demonstrate that something other than "[d]etention of a vessel by admiralty or other court process" occurred to establish that the events in Libya constitute a covered arrest. Haehl, *supra*, at 296. Swift's attempts to do so are unavailing.

Swift relies on Dr. Vandewalle's report for the proposition that the courts in Libya were under the control of Mohamar Qadhafi's regime. Swift Br. 18. In that report, Dr. Vandewalle concludes that "during the 2008-2010 period of importance to this case, the Judiciary was *effectively* under the control of the Qadhafi regime, *or* under the control of those in his immediate circle." Vandewalle Report at 11 (emphasis added). Putting aside the qualifying language from this conclusion, Dr. Vandewalle's characterization of the Libyan Court system suffers from the same shortcoming as his characterization of Libya's economic system: it says nothing about whether the Libyan Court acted in furtherance of the Qadhafi regime, in a sovereign capacity, *in this particular case*. To say that the courts were generally under control of the Libyan government is a far cry from offering evidence that the specific decision to arrest the Swift Spindrift was a sovereign act of the Qadhafi regime. No reasonable jury could reach the latter conclusion with only evidence of the former.

Swift attempts to get around this shortcoming by pointing to what it considers to be evidence that the Libyan Court acted unlawfully in not releasing the Swift Spindrift. Swift Reply Br. 9-10. In particular, Swift claims that the Libyan Court ordered the release of the vessel after Swift posted an irrevocable letter of credit, but then failed to enforce its own order by declining to release the vessel. Swift Opp. Br. 20; Swift Reply Br. 10. Swift's evidence in support of this claim rests on a series of documents relating to the proceedings in Libya. *See* Swift Rule 56.1 Statement ¶¶ 17-20. Those documents include what Swift describes as an order accepting the letter of credit and ordering the release of the vessel, a refusal on the part of the Libyan Foreign Bank to liquidate the letter of credit, and a summary denial of Swift's subsequent petition for the release of the vessel. *Id.* ¶¶ 17, 19, 20.

As an initial matter, the Underwriters challenge all of these documents on the grounds that they are inadmissible hearsay, unauthenticated, and not accompanied by a certified translation. Underwriters 56.1 CS ¶¶ 17-20; Underwriters Opp. Br. 17. Swift never responds to this charge, despite the fact that there is authority in this circuit for declining to consider uncertified translations at summary judgment. *See Regeda v. City of N.Y.*, No. 09-CV-5427

29

(KAM), 2015 WL 5751117, at *2 n.2 (E.D.N.Y. Sept. 30, 2015) ("The court finds plaintiff's translation is inadmissible without a certification of translation . . . and consequently not cognizable on summary judgment."); *see also G. Simons & Co. S.A. v. New Bar of N. Am.*, No. 98–CV–5162 (GBD), 2005 WL 1137348, at *7 (S.D.N.Y. May 13, 2005).

The Court therefore need not rely on the documents cited by Swift in deciding whether Swift has offered admissible evidence that the Libyan Court exercised sovereign authority. But even if the Court were to consider the documents, they do not support Swift's claim. The first court order Swift points to provides permission for the Swift Spindrift to leave its port "*after* depositing the amount equivalent to the Ship Owner's liability," i.e., after providing the requested $1.6 million security. Chalos Decl., Dkt. No. 100, Ex. P (emphasis added). That order is dated January 31, 2009. *Id.* The next document is from the "Bailiffs Department" of the Libyan Court, and it appears to document the delivery of a February 10, 2009 order from the Libyan Court obliging the Libyan Foreign Bank to liquidate the $1.6 million letter of credit that Swift had posted. Chalos Decl., Dkt. No. 100, Ex. Q. Swift claims that it has introduced evidence that "[t]he Libyan Foreign Bank refused to liquidate the letter of credit." Swift Rule 56.1 Statement ¶ 19. But the document it cites for that proposition appears to recount a grievance, filed with the Tripoli Court of Appeal, challenging the Libyan Court's order to liquidate the letter of credit. Chalos Decl., Dkt. No. 100, Ex. R. In other words, the document does not indicate a refusal to comply, but rather constitutes a legal challenge to the Libyan Court's decision. The document further indicates that the Tripoli Court of Appeal was to hold a hearing on the grievance on March 3, 2009. *Id.* There does not appear to be any documentation in the record that speaks to whether that hearing actually took place. Instead, the next action from the Libyan Court that Swift identifies is an order, allegedly dated March 19, 2009, denying a March 9, 2009 petition to release the Swift Spindrift. Swift Rule 56.1 Statement ¶ 20. The text of that order indicates that "[t]his [matter] was considered on 3/17/2009. The petition is dismissed." Chalos Decl., Dkt. No. 100, Ex. S. Swift, however, provides no indication as to what occurred on March 17, 2009. Swift claims that the take-away from these proceedings is

that "[t]he Libyan Court failed to enforce its order releasing the vessel." Swift Reply Br. 10. But none of the documents Swift cites constitute such a refusal. Instead, the documents supply an incomplete picture of the Libyan legal proceedings, and a reasonable jury could not conclude from these documents that the Libyan Court reneged on its own order.

Even if Swift *had* introduced evidence that the Libyan Court refused to follow through on its own order, that would *still* not constitute evidence that the Libyan Court exercised sovereign authority. To say that the Libyan Court's orders were inconsistent or contradictory, is one thing; to say that the orders were issued as an exercise of the Qadhafi regime's sovereign power is something else. To survive summary judgment, Swift needs to connect the specific actions of the Libyan Court in this case to an act of the Qadhafi regime, but it has only offered conclusory allegations to bridge that gap. For instance, Swift describes the Libyan Court's actions as "bizarre, irregular, and *unexplained*," but proceeds to conclude that the actions "were *clearly* those of the 'government' of Libya." Swift Br. 19 (emphasis added). Even allowing all reasonable inferences in Swift's favor, the Court has found nothing in the record that would allow a reasonable jury to conclude that the Libyan Court exercised more than judicial power over a civil dispute. To the contrary, Peter Metz, Swift's sole officer and director, was asked at his deposition whether he was "aware of, apart from the Libyan courts, any other governmental involvement in the refusal to release the vessel." Grasso Decl., Dkt. No. 95, Ex. 1 at 129:4-8. His response was: "Not that I can prove." *Id.* at 129:9.

Swift has failed to put forward "affirmative and specific evidence showing that there is a genuine issue for trial" with respect to whether the arrest of the Swift Spindrift was an exercise of sovereign authority. *Price*, 808 F. Supp. 2d at 685. Instead, it has relied on "conclusory statements" that the actions of the Libyan Court in this case were really those of the Qadhafi regime, rather than the actions of a civil court resolving—perhaps incorrectly—a private commercial matter. *See id.* Without admissible evidence of an exercise of sovereign authority,

Swift cannot recover under the Policies. Summary judgment for the Underwriters is therefore appropriate.[13]

## IV.  CONCLUSION

For the foregoing reasons, the joint motion of the Underwriters for summary Judgment is GRANTED. Swift's motion for summary judgment is DENIED. Gallagher's motion for summary judgment and Swift's responsive cross-motion for summary judgment are DENIED as moot. Swift's motion to exclude is also DENIED as moot.

This resolves Docket Nos. 93, 96, 99, 103, and 123. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: March 2 9, 2016
     New York, New York

ALISON J. NATHAN
United States District Judge

---

[13] Because the Court grants the Underwriters' motion for summary judgment, it denies Gallagher's motion for summary judgment, and the cross-motion that Swift filed in response, as moot. Both motions rest on an affirmative defense raised by the B&P Defendants, which is no longer relevant in light of the Court's resolution of the case. *See* Swift Br. in Opp. to Gallagher MSJ at 2. The Court also denies Swift's motion to exclude as moot, given that the Court need not consider Dr. Karbal's testimony to resolve the Underwriters' summary judgment motion.